COLSTON

*v.*

QUANDER.

(*Special Court of Appeals of Virginia, November, 1877.*)

[Virginia Law Journal, 1877, p. 689.]

### Constitution of 1864—Enfranchisement of Slaves.

The clause of the "Alexandria Constitution," abolishing slavery, adopted April 7, 1864, operated to enfranchise slaves domiciled within the territory subject to the jurisdiction of the "Pierpoint Government," and in the occupation of the federal armies.

### Marriage between Free Negro and Slave—Validity of.

A marriage between a free man of color and a slave woman, with the consent of her master, solemnized before a minister of the gospel, though void when made, is validated, if the parties assent to, and ratify the same after the disability of slavery has ceased.

### Same—Same—Issue.

The issue of such marriage, recognized by the father, is legitimate.

### Same—Same—License—Statute.

The statute requiring marriages to be under license is directory, and the absence of a license does not render the marriage void.

The facts are stated in the opinion.

*Brent & Wattles* and *Ball & Neeson*, for plaintiff in error.

*F. L. Smith, F. L. Smith, Jr.*, and *S. F. Beach*, for the defendant in error.

WINGFIELD, P., delivered the opinion of the court.

This was an action of ejectment brought by the plaintiff in error against the defendant in error to recover two tracts of land situated in Fairfax county. On the trial the jury found a special verdict setting out the following facts, viz. : "That the land in question belonged in fee to Lewis Quander, a free man of color, that the said Lewis Quander intermarried with Susan Pierson, a woman of color, a slave belonging to Levi Burke, on the 11th day of June, 1842, and the said Lewis Quander on the 5th day of May, 1864, died intestate, that the said Susan Pierson was the slave of the said Levi Burke at the time of the marriage, and so continued until the abolition of slavery ; that the said parties were married at the house of the said Burke, by the Rev. Mr. Johnson an Episcopal minister, that the said Lewis lived with his said wife during his lifetime and recognized her as such, and that he had several children whom he recognized during his life as his and who are now living, that John H. Colston, the plaintiff, was the half-brother of Lewis Quander, being both born of the same mother, and that there are no other children or descendants of the said mother now living, and at the institution of this suit the defendant, Susan Quander, (the wife of the said Lewis) was in the possession of the said land."

Upon this verdict the circuit court rendered judgment in favor of the defendant, to which a writ of supersedeas was awarded by a judge of the late district court at Fredericksburg, and it not having been determined there, the case now comes up for review before this court.

The petition of the plaintiff in error assumes that the circuit court decided the case in favor of the defendant under the 2d § of the Act of the General Assembly of the 27th February, 1869, which is in these words : "That where colored persons before the passage of this act shall have

undertaken and agreed to occupy the relation to each other of husband and wife, and shall be cohabiting together as such, at the time of the passage of this act, whether the rites of marriage shall have been celebrated between them or not, they shall be deemed husband and wife, and shall be entitled to the rights and privileges and subject to the duties and obligations of that relation in like manner as if they had been duly married by law ; and all their children shall be deemed legitimate, whether born before or after the passage of this act ; and when the parties have ceased to cohabit before the passage of this act in consequence of the death of the woman, or from any other cause, all the children of the woman, recognized by the man to be his, shall be deemed legitimate.'' And alleges that the judgment is erroneous, and assigns as causes of error :

1st. That Susan Quander, the wife of Lewis, was a negro slave at the time of "the pretended" marriage, and was therefore incapable of contracting (and particularly by the then policy of Virginia) from making the contract of marriage. That the marriage was, therefore, void *ab initio*, and the children bastards, incapable of inheriting from the father, and that no recognition afterwards could make the children legitimate, unless the act above quoted applies.

2d. That the recognition by the father of the children after the parties ceased to cohabit, in order to legitimate them, must be a recognition as well after the cohabitation ceased as after the passage of the act ; and as Lewis Quander died before the passage of the act, he had no opportunity to legitimate the children by recognition, consequently at the time of his death his children were incapable of inheriting and the descent was immediately cast upon Colston, by virtue of which the land in question was his property and vested in him his rights, which no after legislation could affect or divest.

And 3d.    Because under the constitution, rights of property can only be disturbed for public uses, and then upon just compensation.    Without such a grant of power it would be against, and in violation of the nature of our government and free institutions to exercise it at all, in any case.

Now before we inquire into the effect of the act of 27th February, 1869, and the power of the legislature to pass retroactive and retrospective laws affecting vested rights, let us consider how this case stands without regard to the statute of 1869.

The position taken by the counsel of the plaintiff in error is, that the marriage between Quander and his wife, while she was a slave, was of no effect, because of the want of legal capacity in her to contract a marriage and enter into the duties incident to that relation, because of the absolute control of her master over her, and her absolute subjection to his will.    It is universally true, that as a slave she could make no legal contract of marriage or of any other kind. Because as a matter of public policy and a necessity, arising out of their condition, and the relative rights of their owners, slaves being cut off from all civil rights, could not enter into any contract that could be recognized as having any binding force in law.    Yet they undoubtedly had the mental capacity to do a moral act, and might, and certainly did many, with the consent of their masters, and their relation of husband and wife was recognized and respected, and in Virginia so far from there being any policy prohibiting such marriage, as is assumed by the plaintiff, they were countenaced and encouraged by the white people, and masters very often incurred great loss and inconvenience to prevent the separation of husband and wife when estates had to be distributed, or sales became inevitable, and there was nothing more common than for their owners, when making their wills to make provisions against the disruption of the relation

of marriage among their slaves ; and any man who ruthlessly and wantonly dissolved such relation was discountenanced by public opinion.

Now in this case the woman was married, with the consent of her master, by a regularly ordained minister of the Episcopal church (doubtless according to the rites and ceremonies prescribed by it for the solemnization of marriages), and her moral capacity to make a marriage connection cannot be questioned.  Yet by the inexorable law in relation to slavery, this could have no effect as a legal marriage so long as she remained a slave.

Did her subsequent emancipation, coupled with its recognition and ratification, have the effect of legalizing this marriage which was before void and inoperative ?  To come to proper conclusions, we must consider the nature of the law in relation to marriage, what has been ruled in relation to analogous questions arising out of it, and the adjudged cases on the very point (which must necessarily be few), as it is a new question in Virginia and could not have arisen very often any where until recently.

Marriage is a civil contract, and may be entered into by all unmarried persons who have the physical, mental and legal capacity to contract it.  Yet like all other contracts, to make the contract of marriage valid, it must be entered into by the mutual consent of parties having the mental and legal capacity to enter into it, and if this is wanting in either party the marriage is void, unless ratified by such party after the disability is removed ; but if so ratified after the competency of the party is attained or restored, the marriage is valid and binding on the parties, and they need not be married again.  Bishop on Mar. and Divorce, § 55, § 189.

If a lunatic marry, or a person be married by fraud or duress, or if an infant marry before the age of consent, such marriages are void, because marriage is, as already stated,

a civil contract, and the assent of capable minds is necessary to its validity.    But when the lunatic is restored, he or she may, during a lucid interval, affirm the marriage, and it will be good ; or if it is disaffirmed, it will be held a nullity and dissolved.    So when a party is married by fraud or duress, he may, after knowledge of the fraud, or after the cause of fear is removed, by consent and voluntary cohabitation cure the defect.    Bishop on Mar. and Div. § 122. And as we have seen, in such cases of ratification, the marriage is good, and the parties need not be married again. These principles are established by the case of Wightman v. Wightman, 4 Johnson's Chy. Cases 343.    Chancellor Kent, in that case, in his opinion said :    That the fact of the insanity of the plaintiff at the time of the marriage, and the fact that the parties have never since lived together or cohabited, being proved, it followed as a necessary consequence from these facts that the marriage was void from the beginning by reason of the want of capacity to contract, and had never afterwards obtained any validity, because the plaintiff had never since her lucid interval ratified or consummated it. And in the case of Cole v. Cole, 5 Sneed 57, Caruthers, Judge, in delivering the opinion of the supreme court of Tennessee, said :    "If the proof established the fact that she (the plaintiff) was of unsound mind at the time of the marriage, there was abundant proof that she was afterwards restored, at least temporarily, and did not repudiate, but by her acts and conduct, recognized the validity of her marriage—a lunatic on regaining his reason may affirm a marriage, celebrated while he was insane, "and this without any new solemnization ;" and concluded, "we think, the marriage with all of its incidents, rights and duties, was valid and binding on both parties."    I have cited these two cases (and a number of others to the same effect might be cited) to show that a party who was wanting in mental capacity to contract, at the time of the marriage, might ratify

or reject it after the disability was removed ; and if it was ratified, it was good without any new marriage.

By the common law, if a boy under the age of 14 or a girl under 12 years of age married, the marriage was inchoate and imperfect, and either of them might, when they came to the age of consent, disagree to it and declare the marriage void without any divorce or sentence of the spiritual court, but it was so far a marriage that if at the age of consent, they agreed to continue together, they need not be married again.    1st Blackston's Com. 436.

Now, if lunatics and infants, can make marriages, that were void at the time they were entered into for want of legal and moral capacity to contract, good by ratification and consummation after they attained capacity, why may not the contract of marriage, entered into by the defendant in this case with her husband, when she had the moral, and only wanted the legal capacity to make it perfect by a ratification and consummation of it after she attained a legal capacity to do so ?    I can see no reason why, if it may be done in the one case, it cannot be done in the other.    Nor do I think any good reason can be shown for a distinction in the case—it seems to me they stand upon the same principle. Like the case of the lunatic, after the capacity is acquired by being restored to a sane mind, and the infant by having attained to the age at which he may consent, who may make good the marriage before void, by assent and ratification. So in the case of the slave, the former void marriage is made good by ratification and assent after having attained the legal capacity, by being made free.    In either case the marriage depends upon the confirmation of the parties having become capable of doing so.    It would seem that it ought to be as effectual in the one case as in the other.

As far back as the year 1819, the supreme court of Louisiana in the case of Girod v. Lewis, 6 Martin (O. S.) 559,

held, that while a slave had no legal capacity to assent to a contract—with the consent of their masters, they might marry, and had the moral capacity to enter into such a connection. Yet while they remained in a state of slavery it could produce no civil effect. Emancipation gave to the slave his civil rights and a contract of marriage valid and legal by the consent of the master and moral assent of the slave—from the moment of freedom (although dormant during slavery) produced all the effects which result from such contracts among free persons. And the same point was decided in a recent case in Missouri, Johnson v. Johnson, 45 Mo. 595, in which Wagner (Judge), in delivering the opinion of the court after speaking of the rule in relation to confirmation of marriage by a person under disability at the time it was made, after acquiring a capacity to do so, uses this language : ''We may now apply the foregoing principles to the case at bar. The slave in entering into marriage did a moral act, and although not binding at law, it was no violation of any legal duty. If after the emancipation, there was no confirmation by cohabitation or otherwise, it is obvious there would be no ground for holding the marriage as subsisting and binding. But as in the case of other parties incapacitated, we perceive no good reason for holding that the contract may not be assented to and ratified after the incapacity or disability is removed.'' And accordingly it was held, that as the parties cohabited together and acknowledged each other as man and wife after emancipation, the marriage had between them while one of them was a slave, was good, and legally binding on them. These are the only two adjudged cases that I have met with on the point under discussion. The judge in delivering his opinion in the case last mentioned, referred to a very recent case of McReynolds v. The State, 5 Coldw. 18 (which I have not seen), in which it was held, that if after emancipation the parties live together as husband and wife, and before emanci-

pation they were married in the form which either usage, or the law had established for the marriage of slaves, their subsequent mutual acknowledgment of each other as husband and wife should be held to complete the act of matrimony so as to make them lawfully and fully married from the time at which their subsequent living together commenced.

At the time that the defendant and Lewis Quander were married, there was no law prohibiting the marriage of slaves, and according to common usage all over the state, marriages among them were permitted by their owners, and recognized and respected throughout the whole community by both white and colored people.

The statute on the subject then existing, required that marriages should be upon license from the proper officer or after publication of banns, and imposed a penalty on a minister who should perform the marriage ceremony without such license or until after publication of the banns (the right to make which publication was allowed to ministers of the Episcopal church), but a marriage had without them, was no where declared to be void for that reason ; and if the marriage celebrated in this case had been between two free persons, one of whom was under disability, the marriage would have been rendered valid and binding as soon as the party became free from the disability, and recognized and assented to it.    And the same result followed inevitably in this case, as soon as the defendant became free from the disability, under which she then labored, and sanctioned it by continuing to acknowledge, cohabit and live with Lewis Quander as her husband ; that is, if she became free before he died.    When did she become free ?    The parties were domiciled and resided in that part of Virginia which was within the military line and jurisdiction of the federal armies after 1861 until the end of the late war, and within the civil jurisdiction of the government which was set up at Wheeling as the government of Virginia, and removed from thence to Alexandria (commonly called the "Pierpoint government"),

and after the war was over, extended over the rest of the state that remained after its disembursement—and by the constitution which was adopted on the 7th of April, 1864, for the people being under that government, and finally extended over the state (known as the ''Alexandria Constitution''), slavery and involuntary ''servitude, except crime,'' was abolished ''and prohibited in the state forever,'' and consequently the defendant became free on the 7th of April, 1864. And as it is shewn by the record that she and the said Lewis Quander continued to cohabit and live together from that day until his death, acknowledging each other as husband and wife, the marriage between them while she was a slave was reinstated and became a legal and binding marriage from the 7th of April, 1864, with all the force and effect resulting from such a contract between free persons, and subjected the parties to all of the duties, rights and privileges arising out of the relation of legal marriage. And as he recognized the children as his up to the time of his death (which happened on the 5th of May, 1864), although they might have been held to be illegitimate before, yet as his marriage with their mother became effectual and legal from the 7th of April, and he after that and up to the time of his death acknowledged them to be his children, they by the provision of the act of January, 1787, Code 579, became legitimate and his lawful heirs, and they inherited, and the descent of the land in question was cast upon them and not upon the plaintiff, Colston, the half-brother of their father.

And this obviates the necessity of considering the effects of act of the 27th of February, 1869.

I am of opinion to affirm the judgment of the circuit court.

Judgment affirmed.

The other judges concurred.